# No. 23-1021

### In the
## United States Court of Appeals
### For the Eighth Circuit

---

Donald Sanders,

Appellee-Plaintiff,

v.

BNSF Railway Company,

Appellant-Defendant.

---

On Appeal from the United States District Court for the
District of Minnesota, Saint Paul Division
Civil Action No. 17-CV-5106 (ECT/JFD)
Judge Eric C. Tostrud, Presiding

---

## BRIEF OF APPELLANT
## BNSF RAILWAY COMPANY

---

Tracey Holmes Donesky
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 335-1500
(612) 335-1657 (Fax)

Bryan P. Neal
Weston J. Mumme
Holland & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (Fax)

### Oral Argument is Requested
#### Attorneys for Appellant BNSF Railway Company

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Appellee Donald Sanders ("Sanders"), a former employee of Appellant BNSF Railway Company ("BNSF"), sued BNSF under the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"). He alleged that BNSF violated the FRSA by discharging him in retaliation for engaging in protected activity under that statute. A jury found that Sanders proved a FRSA violation and rejected BNSF's "same-decision" defense under the FRSA. Although BNSF disagrees with both determinations, on appeal, it raises only matters relating to the defense.

The district court misunderstood and misapplied the defense, as evidenced by numerous statements and rulings at trial and in addressing BNSF's motion for judgment as a matter of law. Those misunderstandings led the court to issue a wholly inadequate jury instruction on the defense and to reject BNSF's proposed instruction that succinctly outlined the factors this Court and others have determined should be considered when evaluating the defense. Refusing BNSF's requested instruction was harmful error, depriving BNSF of a fair opportunity to prevail on the defense and entitling it to a new trial.

BNSF requests oral argument of 20 minutes per side.

i

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1, BNSF Railway Company ("BNSF") discloses that it is a Delaware corporation and a wholly-owned subsidiary of Burlington Northern Santa Fe, LLC, a Delaware limited liability company. National Indemnity Company ("NICO"), a Nebraska corporation, is the sole member of Burlington Northern Santa Fe, LLC and is a subsidiary of Berkshire Hathaway Inc. ("Berkshire"), a public company. No public company owns more than 10% of Berkshire's stock.

Appellate Case: 23-1021    Page: 3    Date Filed: 04/27/2023 Entry ID: 5270387

# TABLE OF CONTENTS

Summary of the Case and Request for Oral Argument ...........................i

Corporate Disclosure Statement................................................ii

Table of Authorities........................................................v

Jurisdictional Statement....................................................1

Statement of the Issues.....................................................2

Statement of the Case ......................................................3

    A.    Sanders's Employment History .........................................3

    B.    Sanders Committed Time Theft in March 2016....................9

    C.    BNSF's Disciplinary Policy ..................................13

    D.    Sanders's Investigation and Dismissal................................14

    E.    Union Review and Arbitration Proceedings .........................17

    F.    Administrative Proceedings..................................18

    G.    Trial Proceedings ..................................19

Summary of the Argument ....................................21

Argument..................................................23

    A.    Standard of Review for Jury Instruction Challenges...........23

    B.    Law Applicable to the Same-Decision Defense and Specific Factors that Should be Considered. .......................24

    C.    BNSF Presented Evidence Sufficient to Satisfy the Same-Decision Defense Consistent with the Caselaw. ........29

    D.    The District Court Misunderstood Key Aspects of the Same-Decision Defense, As Evidenced By Its Approach to BNSF's Motion for Judgment as a Matter of Law. ..........32

        1.    The district court's preliminary statements about the defense. ..................................32

        2.    The district court's rationale for denying the motion..................................39

Appellate Case: 23-1021    Page: 4    Date Filed: 04/27/2023 Entry ID: 5270387

E.    The District Court's Misunderstanding of the Defense Led it to Incorrectly Instruct the Jury.................................45

F.    The District Court's Instruction Error Prejudiced BNSF, Thus Warranting a New Trial on the Defense. ....................54

Conclusion ...............................................................................56

Certificate of Compliance with Rule 32(a)............................59

ECF Certifications...................................................................60

Certificate of Service .............................................................61

Appellate Case: 23-1021   Page: 5   Date Filed: 04/27/2023 Entry ID: 5270387

# TABLE OF AUTHORITIES

## Cases

*Bauer v. Curators of the Univ. of Mo.*,
  680 F.3d 1043 (8th Cir. 2012) ..................................................... 53

*Belk v. Sw. Bell Tel. Co.*,
  194 F.3d 946 (8th Cir. 1999) ......................................... 2, 47, 48, 49, 54

*Blackorby v. BNSF Ry. Co.*,
  849 F.3d 716 (8th Cir. 2017) ....................................................... 34

*Blackorby v. BNSF Ry. Co.*,
  936 F.3d 733 (8th Cir. 2019) ....................................................... 45

*BNSF Ry. Co. v. U.S. DOL Admin. Review Bd. (Carter),*
  867 F.3d 942 (8th Cir. 2017) ........................................... 18, 25, 38, 39

*Bone v. G4S Youth Servs., LLC*,
  686 F.3d 948 (8th Cir. 2012) ....................................................... 42

*Clark v. Runyon*,
  218 F.3d 915 (8th Cir. 2000) ....................................................... 42

*Cox v. Dubuque Bank & Trust Co.*,
  163 F.3d 492 (8th Cir. 1998) ........................................... 23, 24, 54, 56

*Dafoe v. BNSF Ry. Co.*,
  164 F. Supp. 3d 1101 (D. Minn. 2016) ....................................... 26, 50

*Dakota, Minn. & E. R.R. Co. v. U.S. DOL Admin. Review Bd.*,
  948 F.3d 940 (8th Cir. 2020) ................................................... 37, 38

*Dupont v. Fred's Stores of Tenn., Inc.*,
  652 F.3d 878 (8th Cir. 2011) ................................................... 22, 23

*Epple v. BNSF Ry. Co.*,
  785 F. App'x 219 (5th Cir. 2019) ......................................... 27, 28, 35

v

Appellate Case: 23-1021    Page: 6    Date Filed: 04/27/2023 Entry ID: 5270387

*Fresquez v. BNSF Ry. Co.*,
52 F.4th 1280 (10th Cir. 2022) ........................................... 32

*Koziara v. BNSF Ry. Co.*,
840 F.3d 873 (7th Cir. 2016) ................................... 26, 35, 38

*Kuduk v. BNSF Ry. Co.*,
768 F.3d 786 (8th Cir. 2014) ....................................... *passim*

*Loos v. BNSF Ry. Co.*,
865 F.3d 1106 (8th Cir. 2017) ..................................... 33, 36

*McCoy v. Augusta Fiberglass Coatings*,
593 F.3d 737 (8th Cir. 2010) ............................................ 23

*McKennon v. Nashville Banner Pub'g Co.*,
513 U.S. 352, (1995) ....................................................... 38

*Murray v. UBS Sec., LLC*,
43 F.4th 254 (2d Cir. 2022) ............................................. 35

*Rahn v. Hawkins*,
464 F.3d 813 (8th Cir. 2006) ............................................ 49

*Riser v. Target Corp.*,
458 F.3d 817 (8th Cir. 2006) ............................................ 43

*Rivera v. Illinois*,
556 U.S. 148 (2009) ........................................................ 50

*Todd v. Ortho Biotech, Inc.*,
175 F.3d 595 (8th Cir. 1999) ............................................ 56

*United States v. Owens*,
966 F.3d 700 (8th Cir. 2020) ............................................ 52

*Vance v. Ball State Univ.*,
570 U.S. 421 (2013) ........................................................ 47

*Walker v. AT&T Techs.*,
995 F.2d 846 (8th Cir. 1993) ...................................... 48, 53

vi

*Wurster v. Plastics Grp., Inc.*,
  917 F.3d 608 (8th Cir. 2019) ...................................................... 2, 48, 49

*Yazdianpour v. Safeblood Techs., Inc.*,
  779 F.3d 530 (8th Cir. 2015) .................................................................. 46

*Young v. Builders Steel Co.*,
  754 F.3d 573 (8th Cir. 2014) .................................................................. 42

*Zebley v. Heartland Indus. of Dawson, Inc.*,
  625 F.3d 449 (8th Cir. 2010) ...................................................... 23, 46

## Statutes

28 U.S.C. § 1291 ............................................................................................ 1

28 U.S.C. § 1331 ............................................................................................ 1

45 U.S.C. § 153 .......................................................................................... 17

49 U.S.C. § 20109 ...................................................................................... 24

49 U.S.C. § 20109(a)(1) .......................................................................... 24

49 U.S.C. § 20109(a)(2) .......................................................................... 24

49 U.S.C. § 20109(b)(1)(A) .................................................................... 24

49 U.S.C. § 20109(d)(1) ...................................................................... 1, 18

49 U.S.C. § 20109(d)(2)(A) .................................................................... 25

49 U.S.C. § 20109(e)(3) .......................................................................... 20

49 U.S.C. § 42121 ...................................................................................... 25

49 U.S.C. § 42121(b)(2)(B)(iv) ................................................... 25, 34, 37

## Regulations

29 C.F.R. §§ 1982.103-104 ...................................................................... 18

Appellate Case: 23-1021    Page: 8    Date Filed: 04/27/2023 Entry ID: 5270387

## Other Authorities

8th Cir. Civil Jury Instructions § 18.50 (2021)..................................51, 52

*Model Jury Instructions*, UNITED STATES COURT OF APPEALS
    FOR THE EIGHTH CIRCUIT, https://www.ca8.uscourts.gov/
    model-jury-instructions (last visited Apr. 26, 2023)...........................52

Appellate Case: 23-1021    Page: 9    Date Filed: 04/27/2023 Entry ID: 5270387

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1331 and 49 U.S.C. § 20109(d)(1). This Court has jurisdiction under 28 U.S.C. § 1291, in that the decisions appealed constitute the final, appealable judgments and other orders of a district court, which adjudicated and disposed of all the claims before it. BNSF timely filed its Notice of Appeal on January 3, 2023, within 30 days after the district court's December 5, 2022 entry of its order denying BNSF's motion for judgment as a matter of law. Appx:198, R.Doc:309:38; Appx:199, R.Doc:311:1.

Appellate Case: 23-1021　Page: 10　Date Filed: 04/27/2023 Entry ID: 5270387

# STATEMENT OF THE ISSUES

Did the district court commit reversible error warranting a new trial by giving jury instructions concerning the statutory "same-decision" defense that did not mention any of the factors the caselaw establishes should be considered in deciding whether a railroad employer has proven the defense?

- *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786 (8th Cir. 2014)

- *Wurster v. Plastics Grp., Inc.*, 917 F.3d 608, 615 (8th Cir. 2019)

- *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946 (8th Cir. 1999)

Appellate Case: 23-1021    Page: 11    Date Filed: 04/27/2023 Entry ID: 5270387

## A.  Sanders's Employment History

Donald Sanders worked for BNSF from June 2007 to April 2016. JTTR:2:312:15-313:7, 3:409:25-410:3; Appx:536, 537. The last six years of his employment, Sanders was a track inspector. JTTR:2:313:19-21, 3:427:6-10. Track inspectors assess railroad tracks to determine if they comply with Federal Railroad Administration ("FRA") regulations and BNSF track-safety standards. JTTR:1:52:7-53:14. In particular, track inspectors identify "track defects," which are railroad track conditions that do not meet FRA regulations or BNSF guidelines. JTTR:1:50:6-19, 1:52:7-10, 1:62:16-22. Defects are usually reported within the company by entering information into an electronic database BNSF maintains called TIMS, or Track Inspection Management System. JTTR:1:63:9-18.

---

[1] BNSF cites to its Appendix in the format "Appx:" followed by the appendix page number as well as a line number in some instances. It cites to documents from the district court's docket in the format "R.Doc:" followed by the document number as well as a page number in some instances. Where applicable, BNSF cites to both its Appendix and the district court's docket. BNSF cites to the Jury Trial Transcript in the format "JTTR:" followed by the volume number, page number, and line number.

Track inspectors are also required to address defects by either repairing or "protecting" them. JTTR:1:54:15-55:4. A track inspector protects a defect by reporting it as falling within a particular classification and, depending on the type, reducing the track speed limit (called a "slow order") or removing the track from service. JTTR:1:65:7-66:8, 2:292:15-293:2.

Regardless of the type of defect, track inspectors are obligated as part of their job to report them. JTTR:1:65:7-14. The evidence is undisputed that Sanders reported "thousands" of defects, imposed "hundreds" of slow orders, and removed tracks "hundreds" of times over the course of his career as a track inspector. JTTR:3:428:2-10. It is likewise undisputed that Sanders was never disciplined for any of those actions. JTTR:3:365:1-25.

During the relevant time period, Sanders worked in Dayton's Bluff, Minnesota. JTTR:1:71:6-10. Starting in August 2015, and only for a brief period otherwise, Sanders reported to Roadmaster Blaine Hoppenrath ("Hoppenrath"). JTTR:4:605:9-606:3. Hoppenrath reported to the Division Engineer, Keith Jones ("Jones"). JTTR:1:49:14-25.

Appellate Case: 23-1021    Page: 13    Date Filed: 04/27/2023 Entry ID: 5270387

Though Sanders was generally regarded as being a good track inspector, BNSF introduced evidence reflecting that within the company he had a reputation for being difficult to work with. JTTR:2:256:5-7, 6:839:12-840:6, 6:918:11-24, 6:921:10-922:1. Specifically, Sanders often had trouble engaging in civil discourse when he disagreed with a coworker or supervisor. JTTR:6:918:11-24, 6:921:10-922:1. Sanders was known to quickly become hostile when his opinions were questioned or when he disagreed with policies and directives. JTTR:6:918:11-24, 6:921:10-922:1, 6:931:3-14.

Sanders many times challenged Hoppenrath about her department policies on shift schedules and use of company vehicles, among other things. JTTR:6:847:4-849:1, 6:851:8-852:15. Sanders similarly engaged in disputes with Jones about how Sanders's work should be conducted. JTTR:2:211:18-212:23. Jones regularly pleaded with Sanders, to no avail, to communicate with his coworkers and conduct himself as part of a concerted workforce rather than a team of one. JTTR:2:213:24-214:15, 2:220:1-5. At times, these disagreements created turbulence between Jones and Sanders. JTTR:2:217:21-25.

5

On November 23, 2015, Jones expressed frustration with Sanders about contacting the FRA about a particular defect instead of attempting to address the defect internally. JTTR:4:615:7-11. Jones confirmed his frustration was not that Sanders had contacted the FRA; he was upset that Sanders contacted the FRA without first communicating with management so they could work as a team to resolve the issue. JTTR:4:624:10-625:1, 4:628:17-629:3. During the call, Jones was clearly angry and handled himself unprofessionally. JTTR:2:213:16-21, 4:625:2-10.

Soon after, Sanders met with BNSF Human Resources representative Magenta Eggertsen ("Eggertsen") to voice concerns about how he felt he was being treated by his managers—specifically, Jones and Hoppenrath. JTTR:4:611:13-18; Appx:593-94. During their meeting, Sanders played five audio recordings for Eggertsen. JTTR:4:613:3-8. It turns out that Sanders had been secretly recording conversations with BNSF managers. JTTR:2:205:6-20. One such recording captured the November 23, 2015 conversation between Jones and Sanders. JTTR:4:615:12-15; Appx:593-94.

6

Eggertsen took issue with Jones's use of inappropriate language, including profanity, during the call. JTTR:4:625:2-10. After listening to the five recordings, Eggertsen concluded that Sanders was not "being treated respectfully in all situations." JTTR:4:643:2-13. Based on the totality of the conversations, however, Eggertsen did not believe that Sanders was being targeted in any way. JTTR:4:658:3-8; Appx:574-75.

After meeting with Sanders, Eggertsen made the following recommendation to her HR supervisors:

> Recommendation: Coaching and counseling with Keith Jones. His communication in these phone conversations are not aligned with the BNSF Leadership Model. I also think a letter of anti-retaliation is important because [] Sanders feels already that he is treated different.

Appx:593-94.

Consistent with Eggertsen's recommendations, BNSF issued Jones an anti-retaliation letter directing him to treat Sanders as though he "has never complained of discrimination or opposed perceived discriminatory company practices." JTTR:4:662:18-663:10; Appx:582-83. BNSF also provided Jones a formal coaching and counseling letter mandating that his "use of profanity while expressing frustration with respect to [] Sanders'

7

contact with the FRA is not acceptable and will not be tolerated."
JTTR:4:659:21-23; Appx:580-81.

On December 23, 2015, Eggertsen informed Sanders that the investigation was complete. JTTR:4:663:11-14; Appx:574-75. Eggertsen explained to Sanders that, while Jones's conduct was inappropriate, "BNSF's investigation does not substantiate your allegation that [] Jones and [] Hoppenrath are mistreating and singling you out." Appx:574-75.

On February 24, 2016, Eggertsen gave a presentation on preventing harassment and discrimination in the workplace during a safety meeting. JTTR:4:664:3-11; Appx:551-52. Eggertsen also presented on BNSF's company-vehicle policy. JTTR:4:664:3-11; Appx:551. After the presentation, Sanders asked Eggertsen about the policy, stating he felt he was being "discriminated and harassed against because he isn't allowed to take the company vehicle home." JTTR:4:668:10-23; Appx:552. Eggertsen asked Sanders questions to better understand why he felt he was being targeted, but Sanders did not provide further explanation. Appx:552. Eggertsen nevertheless treated Sanders's comments as a formal complaint. JTTR:4:668:15-23.

8

Eggertsen spoke with Hoppenrath, who confirmed that in some divisions where track inspectors cover larger territories they are allowed to take company trucks home at night because they may be called after-hours to make repairs at far away locations. Appx:552. In Dayton's Bluff, however, the maximum distance a track inspector may need to report is thirty miles. Appx:552. Thus, in Hoppenrath's Division, track inspectors were not allowed to take company vehicles home at night. Appx:552. Eggertsen thus closed Sanders's complaint, finding his allegations were unsubstantiated. JTTR:4:670:5-17; Appx:554-55.

## B.    Sanders Committed Time Theft in March 2016

On March 18, 2016, Sanders told Hoppenrath he needed to leave by 3:00 p.m. JTTR:5:729:13-18, 5:732:4-11. But that afternoon Hoppenrath noticed Sanders was gone by 2:30 p.m. or 2:45 p.m. JTTR:5:732:4-11. She became suspicious of the discrepancy between when Sanders said he needed to leave and when he actually left. JTTR:5:733:18-23, 5:779:14-780:10. That was especially true because Sanders typically worked past 3:00 p.m. JTTR:5:779:14-780:10. After speaking with Jones about what she observed, Hoppenrath decided to observe Sanders the following day to further explore the issue. JTTR:2:138:19-139:8, 5:780:11-17.

9

On March 19, 2016, Hoppenrath arrived at the Dayton's Bluff depot—Sanders's designated work location—at 8:00 a.m. JTTR:5:782:15-783:3. When she arrived, neither Sanders nor his personal vehicle were present. JTTR:5:782:15-783:3. All of BNSF's "hi-rail" trucks—the truck's used by track inspectors while they are inspecting track—were still parked in the lot. JTTR:5:782:15-783:3. Hoppenrath drove past the depot again at 8:30 a.m. and, once again, saw no sign of Sanders. JTTR:5:783:7-19. It was not until 9:15 a.m. that Hoppenrath saw any indication that Sanders had arrived—his personal vehicle was in the lot and his hi-rail truck was warming up. JTTR:5:751:12-23, 5:783:7-19.

That afternoon, at 1:53 p.m., Hoppenrath observed Sanders leaving the depot in his personal vehicle. JTTR:5:786:16-787:1. Sanders did not return to work. JTTR:5:786:16-787:1. Hoppenrath reviewed Sanders's payroll records, which showed that Sanders worked a full eight-hour shift. JTTR:5:795:13-798:6.

Hoppenrath relayed the information to Jones and, at his suggestion, contacted BNSF Labor Relations for advice on how to proceed. JTTR:2:225:3-17. Labor Relations suggested that Hoppenrath observe

10

Sanders on at least one more occasion to determine if the March 19 incident was an anomaly or regular practice. JTTR:5:750:25-751:11.

On March 25, 2016, Hoppenrath again observed Sanders. JTTR:5:789:9-19. On that day, she witnessed Sanders arrive at 7:00 a.m. and depart in his personal vehicle at 10:13 a.m. JTTR:5:789:20-790:24. Despite only working for just over three hours, Sanders entered that he worked eight and one half hours in BNSF's payroll system. JTTR:5:789:20-790:24, 5:812:3-814:1.

On March 26, 2016, Hoppenrath did not see Sanders personally, but when Hoppenrath arrived at the depot at 11:00 a.m., his personal vehicle was gone and his hi-rail truck was parked in the parking lot. JTTR:5:815:21-817:10. According to the track-authority documents,[2] Sanders inspected from 6:47 a.m. to 9:29 a.m.—approximately two and one half hours. JTTR:5:814:10-16. Sanders, however, recorded in BNSF's

_____

[2] For safety purposes, before inspecting a section of track, track inspectors must request and receive track authority, giving them exclusive authority to be on that section of track. Track authority records therefore evidence when a track inspector could have been inspecting. JTTR:2:166:10-14, 2:335:6-11.

11

payroll system that he worked nine hours (eight hours of regular time and one hour of overtime). JTTR:5:814:10-817:10.

Based on Hoppenrath's findings, and input from labor relations, BNSF initiated a disciplinary investigation of Sanders for potential time theft. JTTR:2:143:9-20, 5:792:4-793:5. Consistent with its collective bargaining agreement and standard discipline process, discussed further below, BNSF issued him two investigation notices, one for the March 19 event and another for the March 25 and March 26 events. JTTR:5:792:4-793:5; Appx:201-02, 549. It appeared Sanders had no intention of fixing his time entries. JTTR:2:145:24-146:9. Accordingly, to keep the facts of the investigations separate, BNSF treated the investigations separately, which is not uncommon. JTTR:2:145:24-146:9, 2:146:25-147:10, 7:1188:4-12.

On March 29, 2016, after receiving the investigation notices, Sanders changed his time entries for March 25 and March 26. JTTR:2:173:1-25, 5:817:11-818:25, 6:827:1-24. Specifically, Sanders changed his time to reflect four and one half hours on March 25 and removed the hour of overtime on March 26. JTTR:5:817:11-818:25, 6:827:1-24. These "fixes," however, still failed to accurately reflect the hours he worked on those

12

days. JTTR:5:812:11-814:1, 5:817:11-818:25, 6:827:1-24. On the advice of Labor Relations, BNSF removed Sanders from work and revoked his access to BNSF technology pending the outcome of the investigations. JTTR:2:274:14-17, 5:770:19-771:7, 6:885:1-12.

### C.  BNSF's Disciplinary Policy

BNSF has a disciplinary policy called the Policy for Employee Performance and Accountability (PEPA), which applies to all BNSF scheduled (union) employees, including track inspectors. JTTR:7:1182:11-13; Appx:543-48. PEPA lists three categories of rules violations: standard, serious, and stand-alone dismissible. JTTR:7:1183:11-17.

BNSF's rules prohibit "[t]heft or any other fraudulent act, which may be evidenced by the intent to defraud BNSF or by the taking of BNSF monies or property not due." JTTR:7:1185:11-17; Appx:548. Theft is a "stand-alone dismissible" offense under PEPA, meaning an employee can be fired for one incident regardless of his or her disciplinary history. JTTR:7:1184:6-1185:17; Appx:548. By contrast, the other two violation categories entail a progressive disciplinary process. Appx:545-46.

The collective bargaining agreement covering Sanders requires an investigation before any disciplinary action. JTTR:2:227:11-228:4. An

13

"investigation" in railroad terms is a hearing presided over by a company official. Employees are given notice of the hearing and attend with a union representative. JTTR:5:793:25-795:8. Employees may call witnesses, admit exhibits, question BNSF's witnesses, and testify themselves. JTTR:2:227:14-228:4, 5:793:25-795:8. If BNSF then imposes discipline, the employee (through the union) can appeal, first within BNSF and then to a neutral arbitration board established under the Railway Labor Act. JTTR:3:501:12-503:22; Appx:616-22, 623-27.

## D. Sanders's Investigation and Dismissal

BNSF conducted investigations concerning Sanders's time theft with an uninvolved BNSF manager serving as the conducting officer. JTTR:2:157:2-7, 2:227:11-228:4. During the hearings, BNSF presented the following evidence in support of the allegations: (1) Hoppenrath's testimony; (2) track-authority records for the days in question; (3) and GPS records for Sanders's hi-rail truck. JTTR:5:793:10-24. The records corroborated Hoppenrath's testimony. JTTR:5:795:9-807:10, 5:807:11-820:9; Appx:213:12-222:16, 378:24-383:24, 392:19-396:13.

After the hearings, Jones determined Sanders violated BNSF's policy against theft and recommended that he be dismissed. JTTR:2:229:4-

14

14; Appx:533, 534-35, 599-600, 601-02. Jones sent a summary of the investigation, his recommendation, and the hearing transcripts to BNSF's PEPA team so they could conduct their own independent review. JTTR:2:228:16-229:14, 2:231:1-17; Appx:533, 534-35, 599-600, 601-02.

Sending the materials to the PEPA team was standard practice regardless of any recommendation by Jones. JTTR:7:1186:20-1187:23. Specifically, because Sanders was potentially subject to dismissal given that the violations were stand-alone offenses, BNSF practice requires that the records be transmitted to the PEPA team before a decision is made. JTTR:7:1182:18-1183:6. The PEPA team is a group within BNSF's Labor Relations Department that reviews investigation transcripts and exhibits, as well as employee personnel transcripts to evaluate whether dismissals are consistent with the collective bargaining agreement and BNSF policy. JTTR:7:1181:1-1183:6, 7:1207:12-17. They also ensure that discipline is applied consistently across BNSF so that similarly situated employees are treated similarly. JTTR:2:1182:18-25.

Stephanie Detlefsen ("Detlefsen") was the responsible PEPA team official. JTTR:7:1185:22-24, 7:1186:5-12. Detlefsen had no knowledge of Sanders or any alleged protected activity before receiving the hearing

15

transcripts and dismissal recommendations from Jones. JTTR:7:1185:25-1186:12. In addition, as a member of the PEPA team, Detlefsen also was outside of the management chain of those who made the discipline decision. JTTR:7:1181:23-1182:10.

Detlefsen testified that she independently determined that Sanders's conduct constituted clear-cut cases of time theft in violation of BNSF's conduct rules. JTTR:7:1187:18-1188:4, 7:1190:5-8, 7:1191:16-25, 7:1193:14-22; Appx:599-600, 601-02, 605-12. She gave no weight to Jones's recommendation because her role is to conduct an independent review. JTTR:7:1187:24-1188:4 ("None…. I do my own independent review."). For each investigation, Detlefsen concluded that the evidence supported dismissal under PEPA because Sanders committed time theft, a stand-alone, a stand-alone dismissible offense. JTTR:7:1190:5-8, 7:1191:16-25, 7:1193:14-22, 7:1195:11-16; Appx:599-600, 601-02, 605-12.

Before reaching that conclusion, Detlefsen took note of Sanders's allegations that his supervisors were retaliating against him. JTTR:7:1188:13-19. She consulted with Human Resources and the Law Department. JTTR:7:1188:13-19. In an email exchange with Human Resources Manager Terry Morgan, she advised him of Sanders's allegations

16

and sought guidance on how to proceed. JTTR:7:1188:13-1190:2; Appx:603-04. Morgan responded that she should "consider this case on the merits of the facts and evidence brought forth during the formal [investigation]." JTTR:7:1189:12-18; Appx:603-04. She testified that she did exactly that. JTTR:7:1190:1-2.

After Detlefsen's review, General Manager Chad Sundem also reviewed the investigation materials. JTTR:7:1195:17-23; Appx:607. Sundem agreed that Sanders committed time theft and should be dismissed. JTTR:7:1195:17-23; Appx:607. BNSF therefore terminated Sanders's employment for misconduct and theft of time on April 29, 2016. Appx:536, 537.

### E. Union Review and Arbitration Proceedings

Sanders's union appealed the dismissal decision internally to Sundem. JTTR:3:501:12-502:11; Appx:616-22. Sundem denied the appeal. JTTR:2:283:10-17, 3:435:1-10. The union then pursued arbitration on his behalf, appealing to the National Railroad Adjustment Board ("NRAB"), an arbitration panel established pursuant to the Railway Labor Act.[3] The

---

[3] *See* 45 U.S.C. § 153.

Appellate Case: 23-1021    Page: 26    Date Filed: 04/27/2023 Entry ID: 5270387

NRAB also upheld the decision. JTTR:3:503:1-24; Appx:623-27. The NRAB determined that "there is substantial evidence in the record upon which to conclude that [Sanders] falsified his time records by submitt[ing] payroll records claiming that he worked more hours than he actually worked." Appx:623-27.

## F. Administrative Proceedings

Sanders filed a FRSA complaint with OSHA on September 13, 2016, alleging that BNSF fired him in retaliation for FRSA protected activity, which he contends he routinely engaged in during his work as a track inspector. Appx:613-15.[4] OSHA investigated and dismissed the complaint, finding there was no reasonable basis to believe that BNSF violated the FRSA as BNSF established a credible defense justifying its actions. Appx:613-15. OSHA further stated that the "FRSA does not protect an employee from disciplinary action for misconduct." Appx:613-15.

---

[4] The FRSA requires that a claim first be presented to the Secretary of Labor, 49 U.S.C. § 20109(d)(1), which has assigned responsibility for investigating such claims initially to OSHA, 29 C.F.R. §§ 1982.103-.104. *See BNSF Ry. Co. v. U.S. DOL Admin. Review Bd. (Carter)*, 867 F.3d 942, 944 (8th Cir. 2017).

Appellate Case: 23-1021     Page: 27     Date Filed: 04/27/2023 Entry ID: 5270387

### G. Trial Proceedings

Sanders then sued BNSF under the FRSA. Appx:6-8, R.Doc:1:6-8. BNSF moved for summary judgment, which the district court denied. Appx:27-28, R.Doc:65; Appx:29-68, R.Doc:92. The case proceeded to a jury trial beginning on December 6, 2021. JTTR:1:2:8; R.Doc:201.

Before trial, BNSF submitted a proposed jury instruction on its same-decision affirmative defense that outlined the statutory language along with factors this Court and others have used to evaluate the defense. Appx:86, R.Doc:136:18. The district court's final instruction, however, removed all of the language BNSF proposed that outlined factors the jury should consider when deciding whether the defense had been proved. Appx:123, R.Doc:223:26. The court's final instruction left the jury with nothing but a bare statement of the defense, with no guidance on how to go about assessing whether BNSF had proved it. Appx:123, R.Doc:223:26. BNSF timely objected to the court's instruction and its omission of factors necessary to guide the jury's analysis. JTTR:7:1135:5-18, 7:1138:11-16.

The jury returned a verdict in Sanders's favor, awarding him $611,797.00 in back pay damages and $250,000 in emotional distress

19

damages. Appx:129-30, R.Doc:225. The parties then presented evidence to the jury on punitive damages in a second trial phase. JTTR:8:1346:7-20. The jury then returned a verdict awarding punitive damages of $8,600,000. Appx:131, R.Doc:226.

The district court did not enter judgment at that time because it had yet to decide front pay, and BNSF also sought reduction of the punitive damages award to the FRSA's statutory cap. Appx:132-34, R.Doc:232; Appx:135-36, R.Doc:234. The parties filed motions on those topics. Appx:137-38, R.Doc:243; Appx:139, R.Doc:249. When the district court ruled, it awarded Sanders $78,010.24 in front pay, Appx:150, R.Doc:265:11, and reduced punitive damages to the $250,000 statutory cap, 49 U.S.C. § 20109(e)(3). The court then entered judgment. Appx:155, R.Doc:266.

BNSF timely filed post-judgment motions under Rules 50 and 59, Appx:158-60, R.Doc:284, and Sanders moved for attorney's fees, Appx:156-57, R.Doc:272. The district court denied BNSF's motions and awarded Sanders $1,105,780.50 in attorney's fees and $34,415.35 in litigation expenses and costs. Appx:198, R.Doc:309:38. BNSF timely appealed. Appx:199, R.Doc:311:1.

20

## SUMMARY OF THE ARGUMENT

The jury determined that Sanders satisfied his initial (sometimes called "prima facie") case of proving a violation under the FRSA and also rejected BNSF's statutory same-decision defense. Although BNSF disagrees with the first finding, on appeal it has elected to challenge only matters relating to the defense. Specifically, BNSF contends that the district judge incorrectly instructed the jury on the defense such that this Court should reverse and order a new trial.

The same-decision defense defeats liability under the FRSA. To establish the defense employers must demonstrate by clear and convincing evidence that they would have taken the same adverse action challenged in the lawsuit whether or not the plaintiff employee engaged in protected activity. It comes into play only after a plaintiff has proven its initial case of retaliation by demonstrating that an unlawful retaliatory motive played a contributing role in the challenged adverse action. The defense precludes liability when an employer would have reached the same conclusion notwithstanding consideration of any protected activity.

This Court and others have articulated several factors relevant to

21

determining whether a defendant has established the same-decision defense. They include such things as considering the employer's investigation, its policies, and approval or not of others in senior management. Those factors, while logical on a proper understanding of the statute, are not intuitive and need to be explained before a jury can appreciate the value and purpose of certain evidence. Without such an explanation, there is no way for a jury to know that it should consider the evidence it heard on those factors to evaluate the defense. Depriving an employer of jury instructions on those critical factors thus prevents the employer from receiving fair consideration of its defense.

The purpose of jury instructions is to guide the jury's deliberations by focusing them on what is relevant. BNSF's proposed instruction provided that guidance, but the district court rejected it, and on grounds that the court's later ruling on post-trial motions disclosed as seriously mistaken. The erroneous instructions thus failed to "fairly and adequately represent the evidence and law in light of the issues presented to the jury." *Dupont v. Fred's Stores of Tenn., Inc.*, 652 F.3d 878, 882 (8th Cir. 2011). That failure affected BNSF's substantial rights—proper consideration of its affirmative defense—and thus warrants a new trial.

22

ARGUMENT

## A.    Standard of Review for Jury Instruction Challenges.

This Court reviews a district court's jury instructions for an abuse of discretion. *Dupont*, 652 F.3d at 882 (8th Cir. 2011). Taken as a whole, jury instructions must "fairly and adequately represent the evidence and law in light of the issues presented to the jury." *Id.* (quoting *Zebley v. Heartland Indus. of Dawson, Inc.*, 625 F.3d 449, 455 (8th Cir. 2010) (alteration omitted). While the district court possesses broad discretion in instructing the jury, reversal is warranted where the instructions affect the substantial rights of a party. *McCoy v. Augusta Fiberglass Coatings*, 593 F.3d 737, 744-45 (8th Cir. 2010).

This Court has "adopted a standard of review that divides the inquiry of whether the district court abused its discretion when it refused to adopt a proposed instruction into three parts: the proposed instruction must (1) correctly state the applicable law; (2) address matters not adequately covered by the charge; and (3) involve a point so important that failure to give the instruction seriously impaired the party's ability to present an effective case." *Cox v. Dubuque Bank & Trust Co.*, 163 F.3d

23

492, 496-97 (8th Cir. 1998) (internal quotations omitted). Despite the deferential standard of review, when those three tests are satisfied, as they are here, the Court will reverse the district court's judgment and remand for a new trial. *Id.*

## B. Law Applicable to the Same-Decision Defense and Specific Factors that Should be Considered.

The FRSA prohibits discrimination against railroad employees for engaging in specified protected activities, *i.e.*, retaliation. 49 U.S.C. § 20109.[5] Under this Court's precedent, a plaintiff must first make out an initial case (sometimes called a prima facie case) by demonstrating that: "(i) he engaged in a protected activity; (ii) BNSF knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference

---

[5] Sanders claims that he engaged in protected activity during his career through contacting the FRA regarding potential track defects, *see* 49 U.S.C. § 20109(a)(1), refusing to reclassify or remove track defects in violation of Federal law and BNSF regulations, *see id.* § 20109(a)(2), and reporting track defects to the FRA and BNSF, *see id.* § 20109(b)(1)(A). BNSF disputed the existence of protected activity below but does not do so on appeal.

Appellate Case: 23-1021     Page: 33     Date Filed: 04/27/2023 Entry ID: 5270387

that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 788 (8th Cir. 2014).

Even if a plaintiff carries that burden, however, the FRSA allows an employer to avoid liability by demonstrating through clear and convincing evidence that it "would have taken the same…[adverse action] in the absence of the [protected conduct]"—also known as the "same-decision defense." *Id.* at 789; *U.S. DOL Admin. Review Bd.*, 867 F.3d at 949; *see* 49 U.S.C. § 42121(b)(2)(B)(iv); *id.* § 20109(d)(2)(A) (incorporating standards from § 42121).

Courts analyzing the FRSA defense have developed a number of factors to consider and have granted judgment as a matter of law, including to BNSF, based on those factors. The factors demonstrate that deciding whether an employer has proved the defense is not a straightforward, simple answer to a question tracking the statutory language, but requires consideration of various circumstances.

For example, in *Kuduk*, 768 F.3d at 792-93, this Court held that BNSF established the defense on summary judgment with evidence that it (a) investigated the alleged misconduct; (b) conducted a formal hearing; (c) referred the evidence from the hearing to a disinterested manager to

25

make a decision; (d) had the decision approved by others in senior management; (e) allowed the employee to appeal the decision; (f) continued to negotiate an appropriate final resolution with the union after the discharge; and (g) presented uncontroverted evidence that it consistently enforced a policy calling for dismissal after a second serious incident within twelve months.

Courts in this Circuit also cite to *Dafoe v. BNSF Ry. Co.*, 164 F. Supp. 3d 1101 (D. Minn. 2016), which offers a comprehensive list of factors to consider when analyzing the defense:

> (1) whether the railroad has written policies addressing the alleged misconduct, (2) whether the railroad followed applicable investigatory and disciplinary procedures, (3) whether the dismissal was approved by others in senior management, (4) whether the dismissal was upheld on appeal, (5) the temporal proximity between the non-protected conduct and the adverse actions, (6) whether the railroad consistently enforces the policies and rules at issue, and (7) the independent significance of the non-protected activity.

*Id.* at 1115-16 (citations omitted) (internal quotation marks omitted). The district court here recited those factors in ruling on BNSF's motion for judgment as a matter of law. Appx:170-71, R.Doc:309:10-11.

In *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 879 (7th Cir. 2016), the Seventh Circuit held that BNSF established the defense as a matter of

26

law at trial by presenting unrebutted evidence that it believed the plaintiff had stolen from it, BNSF had policies prohibiting theft, the decision was not related to protected activity, and there was no evidence that BNSF would fail to discipline someone in the same manner who committed a similar rule violation.

In *Epple v. BNSF Ry. Co.*, 785 F. App'x 219 (5th Cir. 2019), the Fifth Circuit held that BNSF established the defense as a matter of law at trial. In doing so the court discussed this Court's decision in *Kuduk*, analyzing that decision and the relevance of the factors this Court identified. *Id.* at 223 ("The disciplinary process in this case bears close resemblance to the procedures and safeguards that the defendant followed, and that the Eighth Circuit upheld as clear and convincing evidence."). Ultimately, the Fifth Circuit held that BNSF was entitled to judgment as a matter of law where BNSF conducted a formal investigation, managers removed from the plaintiff's claimed protected activity reviewed the findings and reached a decision, the discipline was appropriate under applicable company policy, and the plaintiff had previously engaged in protected conduct but not been disciplined. *Id.* at 223-24.

Appellate Case: 23-1021     Page: 36     Date Filed: 04/27/2023 Entry ID: 5270387

The Fifth Circuit also explained why those things matter for the defense:

> [I]t is easy to see why the [Eighth Circuit in *Kuduk*] gave these procedures so much weight. The proceedings themselves cost time, money, and resources. A company signals its concern when it is willing to expend these resources to uncover the truth about an employee's conduct. The procedures also have the added benefit of diluting the influence of any individual with an improper motive. The more layers of review and the more personnel involved makes it less likely for bad actors to steer the process toward an outcome the company would not have otherwise chosen. The company essentially limits the possibility that it pursued disciplinary measures for any reason other than the employee's wrongful conduct.

*Id.*

As set out in more detail below, BNSF asked for jury instructions informing the jury of the relevance of the considerations those cases have identified—matters that would not be intuitive in considering a bare statement of the defense. Because consideration of those factors is integral to the defense, the district court should have included them in its jury instructions. Failure to do so denied BNSF a fair opportunity to prevail on the defense and entitles BNSF to a new trial.

Appellate Case: 23-1021     Page: 37     Date Filed: 04/27/2023 Entry ID: 5270387

### C. BNSF Presented Evidence Sufficient to Satisfy the Same-Decision Defense Consistent with the Caselaw.

BNSF's rules prohibit dishonesty, treating it as a stand-alone dismissible offense. JTTR:7:1184:6-1185:17; Appx:548. BNSF followed the procedures in the collective bargaining agreement for Sanders's disciplinary process, including through providing a hearing where Sanders could present witnesses and question BNSF's witnesses. JTTR:2:227:11-228:4, 5:793:25-795:8. The dismissal decision was made by multiple levels of disinterested neutrals who were far removed from Sanders's alleged protected activities. JTTR:7:1181:23-1182:10, 7:1191:16-25, 7:1193:14-22, 7:1195:17-23; Appx:605-07. BNSF put on evidence that it consistently enforces its rules relating to dishonesty and has discharged other employees specifically for time theft. JTTR:7:1196:3-1201:13; Appx:628-37.

On the latter point, Detlefsen testified regarding an investigation into D.R., a former Twin Cities employee. JTTR:7:1196:3-197:20; Appx:628-29. D.R. requested approval for leave to go to a dentist appointment. JTTR:7:1196:3-197:20; Appx:628-29. D.R.'s supervisor allowed him to take leave, but wanted to follow up to make sure he actually went to the dentist. JTTR:7:1196:3-197:20; Appx:628-29. Through monitoring,

Appellate Case: 23-1021   Page: 38   Date Filed: 04/27/2023 Entry ID: 5270387

BNSF noted that D.R.'s vehicle did not move for multiple days. JTTR:7:1196:3-197:20; Appx:628-29. D.R. nevertheless entered time for those days and claimed to have been working, thus claiming pay for hours he did not work, *i.e.*, time theft. JTTR:7:1196:3-197:20; Appx:628-29. BNSF issued a notice of investigation and suspended D.R. pending the results of that investigation. JTTR:7:1196:3-197:20; Appx:628-29. After the hearing, Detlefsen reviewed the investigation and upheld the dismissal. JTTR:7:1196:3-197:20; Appx:628-29.

Detlefsen also testified about C.M. JTTR:7:1196:3-6, 7:1199:2-22. C.M. was investigated after being accused of claiming credit for overtime he did not work, *i.e.*, time theft. JTTR:7:1199:2-22; Appx:630-31. C.M.'s supervisor monitored him for three days, taking pictures of his work vehicle and screenshot of their text communications. JTTR:7:1199:2-22; Appx:630-31. The results revealed a discrepancy with C.M.'s time entries of five and one half hours. JTTR:7:1199:2-22; Appx:630-31. Again, BNSF investigated for time theft and, after the investigation, Detlefsen upheld the dismissal recommendation. JTTR:7:1199:2-22; Appx:630-31. Sundem also reviewed that file and upheld dismissal of C.M. JTTR:7:1199:2-22; Appx:631.

30

BNSF further presented evidence that it dismissed R.M. for time theft. JTTR:7:1196:3-6, 7:1200:13-24; Appx:634-35. R.M. left work early one day and still claimed a full eight hours. JTTR:7:1200:13-24; Appx:634-35. At the hearing, R.M. claimed it was only two-and-a-half hours of time theft. JTTR:7:1200:13-24; Appx:634-35. Still, BNSF terminated his employment for a stand-alone violation and PEPA upheld that decision. JTTR:7:1200:13-24; Appx:634-35.

The evidence also demonstrated that the BNSF decisionmakers as to Sanders's dismissal honestly believed Sanders repeatedly engaged in significant misconduct by falsifying his time on multiple occasions. JTTR:7:1191:16-25, 7:1193:14-22, 7:1195:17-23; Appx:603-04, 605-07. Indeed, Hoppenrath's findings were corroborated by both track-authority records and GPS data evidencing the location of Sanders's hi-rail truck. JTTR:5:793:10-24, 5:795:9-807:10, 5:807:11-820:9; Appx:213:12-222:16, 378:24-383:24, 392:19-396:13. And as shown below, Sanders did not present any evidence that BNSF would not fire an employee for time theft. Finally, there is significant evidence that BNSF prohibits discrimination and retaliation, and trains its employees on that prohibition. JTTR:4:662:18-663:10; Appx:582-83, 593-94.

Appellate Case: 23-1021    Page: 40    Date Filed: 04/27/2023 Entry ID: 5270387

In short, BNSF presented ample evidence on a number of the factors this Court and others have held are applicable to evaluating the same-decision defense.

**D. The District Court Misunderstood Key Aspects of the Same-Decision Defense, As Evidenced By Its Approach to BNSF's Motion for Judgment as a Matter of Law.**

The district court misunderstood key aspects of the same-decision defense, as evidenced by statements the court made in addressing BNSF's motion for judgment as a matter of law and the ultimate resolution of that motion. Although BNSF is not asking the Court to reverse the ruling on that motion, it identifies those errors as evidencing a misunderstanding that explains the district court's failure to properly instruct the jury.

**1. The district court's preliminary statements about the defense.**

Two statements by the district court in describing the defense highlight its misunderstanding:

- First, the district court stated that "[t]his defense may fail if the disciplinary charge 'was false, pretextual, and motivated by discriminatory animus,' or if the decisionmakers were not

32

independent from the bad actors." Appx:170, R.Doc:309:10 (quoting *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1310–11 (10th Cir. 2022)).

- Second, the district court concluded that, "[b]ecause BNSF's basis for Sanders's termination is time theft, it must have proven the alleged time theft to be of such a nature that, combined with BNSF's regular business practices, it clearly and convincingly rose to a level *requiring* termination—*totally apart* from his protected activity." Appx:171, R.Doc:309:11 (emphasis added).

The initial clause of the first statement—that the defense fails if the disciplinary charge was false, pretextual, and motivated by discriminatory animus—reflects that the district court incorrectly believed that the same-decision defense fails if there is sufficient evidence that the employer's decision was retaliatory. That is not the law.

As the district court noted, courts "analyze FRSA retaliation claims in two steps. First, the plaintiff must make a prima facie case. If the plaintiff satisfies this requirement, the railroad has the opportunity to

33

demonstrate by clear and convincing evidence that it would have discharged the employee even if he had not engaged in protected activity." Appx:170, R.Doc:309:10 (quoting *Loos v. BNSF Ry. Co.*, 865 F.3d 1106, 1112 (8th Cir. 2017), *rev'd in part on other grounds*, 139 S. Ct. 893 (2019)). Accordingly, the defense only arises *after* the plaintiff has proven a violation by satisfying the claimant's initial case.

As is well-settled in this circuit, that showing includes proving *intentional retaliation by the employer*. *Kuduk*, 768 F.3d at 791 ("[T]he contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity."); *see Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 722 (8th Cir. 2017), *reh'g denied* (8th Cir.), *cert. denied*, 138 S. Ct. 264 (2017) (confirming that *Kuduk* requires a showing of intentional retaliation). The defense, therefore, arises if and only if the plaintiff has already proven intentional retaliation.

Here, BNSF disputed that Sanders had offered such proof at trial, but the jury disagreed and BNSF has chosen not to challenge that finding on appeal. To say that such a finding—or the evidence supporting such a finding—precludes an employer from establishing the defense, however,

34

is illogical and wrong. That approach eliminates the defense and means it could never be satisfied in any case where it is needed.

The point of the defense is to allow employers to avoid liability in some cases even when the plaintiff has shown retaliation. *See, e.g., Kuduk*, 768 F.3d at 792-93; 49 U.S.C. § 42121(b)(2)(B)(iv). It is intended to preclude liability so long as the plaintiff's conduct—or more accurately the employer's understanding of the plaintiff's conduct[6]—is such that it would have led to the employee's discharge anyway. *Id.*; *see also Murray v. UBS Sec., LLC*, 43 F.4th 254, 262 (2d Cir. 2022), *petition for cert. filed* (U.S. Jan. 18, 2023) (No. 22-660) (explaining that a jury's finding against an employer on the defense did not cure an improper failure to instruct

---

[6] *See Kuduk*, 768 F.3d at 793 (rejecting argument that plaintiff disputing the existence of a violation defeats the same-decision defense); *see also Epple*, 785 F. App'x at 224 (emphasizing that what matters for the defense is the employer's belief regarding the conduct, that is, the "perceived conduct"); *Koziara*, 840 F.3d at 875 (pointing to BNSF's "unrebutted evidence that BNSF believed that the plaintiff had stolen" BNSF property as supporting the defense).

Appellate Case: 23-1021     Page: 44     Date Filed: 04/27/2023 Entry ID: 5270387

the jury that the plaintiff's initial case required a showing of intentional retaliation).[7]

The second part of the first statement—that the defense fails if the decisionmakers were not independent from a manager allegedly acting with retaliatory motive—is equally and similarly flawed. As noted above, the plaintiff's initial case requires it to prove that intentional retaliation contributed to the decision at issue. To prove a violation in the first place, then, a plaintiff must show that someone acting with an improper motive has sufficiently influenced the adverse action (here, termination of employment) so as to hold the company responsible for intentional retaliation. *E.g., Loos*, 865 F.3d at 1112 (holding that an FRSA plaintiff "must show that intentional retaliation prompted by a protected activity was a contributing factor"). If such an actor has not been involved in the decision, there can be no showing of retaliation and the defense never comes into play. So, again, the district judge's understanding eliminates the defense in all cases. Indeed, that is exactly why this Court and others have

---

[7] For those same reasons, it was also incorrect when the district court stated that "BNSF did not meet this standard for reasons that overlap with the contributing-factor analysis." Appx:171, R.Doc:309:11.

said that a relevant factor for the same-decision defense concerns approval and review by *other* individuals in senior management. *Kuduk*, 768 F.3d at 788, 790-91, 792 (affirming summary judgment for BNSF where "decision [was] approved by others in senior management" even though managers allegedly acting with illegal motives had been involved in identifying the misconduct and with the company's investigation into the misconduct).

The district court's second statement—that BNSF had to prove that the alleged time theft was of such a nature that, combined with BNSF's regular business practices, it clearly and convincingly rose to a level *requiring termination*—is also incorrect. That statement goes too far and impermissibly increases BNSF's burden. To establish the defense, an employer must prove only that it *would have* dismissed the employee, not that it was *required* to dismiss the employee. *See* 49 U.S.C. § 42121(b)(2)(B)(iv) (defense applies if "the employer *would have* taken the same unfavorable personnel action"). Although showing a company policy *requiring* termination logically would make the defense easier to prove in a given case, the language of the defense does not mandate such proof. *Id.*

37

Finally, in the second part of the second statement, the district court stated that BNSF had to prove that it would have terminated Sanders's employment "totally apart from his protected activity." Appx:171, R.Doc:309:11. Although it is undoubtedly easier to prove the defense when the employer's decision is "totally apart" from the employee's protected activity, doing so is not a requirement. *See Dakota, Minn. & E. R.R. Co. v. U.S. DOL Admin. Review Bd.*, 948 F.3d 940, 946 (8th Cir. 2020) (describing "the common FRSA retaliation case" as cases "where the employee's protected activity was unrelated to the conduct for which he or she was disciplined"). This Court has squarely rejected the district court's statement:

> [I]n rejecting BNSF's contention that it proved it would have fired Carter even in the absence of his FRSA-protected activity, the ARB summarily affirmed the ALJ, who ruled: "It is virtually impossible for [BNSF] to establish that it would have fired Mr. Carter for dishonesty on his employment application absent his workplace injury and its report, for the simple reason that, had Mr. Carter not suffered this injury, which ultimately led to a lawsuit under the FELA, [BNSF] would not have learned about the injuries and military history that were the basis for its dismissal of Mr. Carter." This reasoning is nothing more than the ALJ's flawed chain-of-events causation theory and *should be disregarded* on remand.

Appellate Case: 23-1021   Page: 47   Date Filed: 04/27/2023 Entry ID: 5270387

*U.S. DOL Admin. Review Bd.*, 867 F.3d at 949; *see Dakota*, 948 F.3d at 947 ("In this case, the ARB did not even attempt to apply the appropriate Eighth Circuit legal standard, and its chain-of-events causation analysis is even more flawed than in *BNSF Railway (Carter).*"); *see also Koziara*, 840 F.3d at 875 (emphasizing that even when an injury report triggers an investigation that uncovers misconduct the defense is available because "once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information…'") (quoting *McKennon v. Nashville Banner Pub'g Co.*, 513 U.S. 352, 362, (1995)). The district court here was under the identical misunderstanding corrected by this Court when made by the ALJ and the ARB in *Carter*.

### 2. The district court's rationale for denying the motion.

The district court premised its denial of BNSF's motion for judgment as a matter of law on two primary considerations: "The evidence cutting against BNSF's affirmative defense is primarily that [1] similarly situated employees were treated less harshly than Sanders

Appellate Case: 23-1021    Page: 48    Date Filed: 04/27/2023 Entry ID: 5270387

and [2] the disciplinary review by Detlefsen and PEPA was insufficiently independent of Jones's influence." Appx:171, R.Doc:309:11.

Regarding comparators, the district court said that "other similarly situated BNSF employees also committed time theft and also went through the disciplinary process but were not terminated." Appx:171-72, R.Doc:309:11-12. That is incorrect. In support of its statement, the district court pointed to two individuals, Appx:172, R.Doc:309:12, but neither committed time theft.

B.K. was a truck driver, not a track inspector. JTTR:6:855:20-21. B.K. was investigated for inaccuracies concerning his DOT logbooks, which were not at issue with Sanders. JTTR:2:232:17-233:13, 6:856:6-23. Still, BNSF treated B.K. and Sanders identically until there was a legitimate reason to treat them differently. *See* JTTR:6:855:4-857:18 (Hoppenrath providing testimony that (1) B.K.'s conduct led her to investigate his activities, (2) she reviewed his DOT logbooks and time entries during her investigation, (3) she determined that a CBA hearing notice should be issued to B.K., (4) B.K. was removed from service pending his CBA hearing, and (5) she testified at the CBA hearing).

40

What distinguishes B.K. and Sanders is that, although there were discrepancies with B.K.'s DOT logbooks, he was not claiming credit—and thus seeking to be paid—for time not actually worked. JTTR:2:232:22-233:13 (Jones explaining it was not a situation like Sanders's where "I'm not here today, but I'm going to pay myself eight hours"). Accordingly, following B.K.'s hearing,[8] BNSF offered him a waiver of his right to an investigation, which he signed, admitting responsibility, accepting assessment of a Level S 36-day suspension and 1-year review period, and

---

[8] During her testimony, Detlefsen provided a detailed explanation outlining the practical, business reasons a waiver might be offered following a hearing:

> [I]t's usually because there was something wrong with the record, so either there was a fatal flaw, which means it wouldn't go past arbitration because of some sort of procedural error, like time limits, or sometimes there's an exchange of exhibits that's supposed to happen 48 hours ahead of time, and if that step wasn't taken, then that could be a fatal flaw, so there could be procedural errors with the record.

> Or it could just be sort of a weak record. Generally speaking, our company witness might not have done a good job testifying about the rule violations or how the behavior was connected, or maybe the employee himself gave plausible reasons that could maybe explain away things. So just generally the weakness of the record.

JTTR:7:1222:9-22.

Appellate Case: 23-1021    Page: 50    Date Filed: 04/27/2023 Entry ID: 5270387

waiving any right to arbitrate the discipline. JTTR:2:232:22-233:13, 7:1216:1-17.

J.K. is likewise not a relevant comparator. J.K. was a welder, not a track inspector. JTTR:2:233:19-234:7. Furthermore, his alleged violation was completely different from Sanders's: J.K. was investigated for lying to Jones about why he had not completed a task—not time theft. JTTR:2:233:14-234:19. According to Jones: "[J.K.] lied to me. But it was no[t] time theft. He was at work all day. He just didn't use a lot of his time wisely. So he didn't steal time. He just wasn't accurate on his efforts on what he was trying to do for the day." JTTR:2:234:15-19.

With those material differences, BNSF's treatment of B.K. and J.K. is not even enough to permit an inference of retaliatory intent. They reflect the very type of "mitigating or distinguishing circumstances" that the similarly-situated legal standard expressly allows. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (holding similarly-situated standard only met where other employee "dealt with the same supervisor, [was] subject[ed] to same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances"); *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000) ("To be probative evidence

42

of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness.").[9]

But on the defense, as explained above, retaliatory intent is not the question anyway. To rebut the same-decision affirmative defense, evidence of the employer's treatment of other employees must focus on the same reason the employer gave for the adverse action against the plaintiff, or very close to it, not merely "similar" or "comparable" reasons. The evidence serves a different purpose than the familiar use of "comparators" to prove that animus against protected activity contributed to the challenged adverse action. In raising the affirmative defense the employer asserts that the *nature of the employee's misconduct*, as honestly understood by the employer at the time, is such that under the employer's policies and according to its consistent practice

---

[9] BNSF also disagrees with the district court's decision to rely on comparators that did not have the same job position or job duties as Sanders. *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) ("Young cannot show he was similarly situated 'in all relevant respects' to any of the other Wage Group 3 employees because he cannot show he could perform their jobs.") (internal quotation omitted); *Riser v. Target Corp.*, 458 F.3d 817, 822 (8th Cir. 2006) (determining the plaintiff's coworkers were not similarly situated because, among other things, the co-workers had different job duties and job positions).

43

virtually any employee committing the misconduct will be discharged. Proof that other employees who engaged in the same conduct were not discharged would, without explanation, contradict the employer's implied assertion of consistent practice. But because the defense turns entirely on the nature of the employee's misconduct, evidence of other misconduct that the judge or a jury may think the employer *should* treat as similar to the employee's conduct is irrelevant: it has no tendency to make more likely or not the employer's implied assertion of a consistent practice of discharging employees who engaged in the same misconduct the plaintiff engaged in.[10] The district court's discussion of B.K and J.K. as comparators, for purposes of the defense in particular, was error.

BNSF discussed above the district court's misunderstanding of the law on the second point: the district court was legally incorrect in believing that BNSF must prove its decision was independent of Jones's

---

[10] Although it concerned a somewhat different point, the district judge did side with BNSF that the test for evaluation of proposed comparators used for purposes of the plaintiff's initial case is not the same as that for evaluating comparators offered by BNSF for purposes of the defense. JTTR:7:1232:12-25. The district judge seemingly later abandoned this logic in assessing whether BNSF established its defense in response to post-trial motions. Appx:171-72, R.Doc:309:11-12.

Appellate Case: 23-1021     Page: 53     Date Filed: 04/27/2023 Entry ID: 5270387

influence. BNSF was not required to show that Detlefsen never spoke to Jones or that Jones was not at all involved in the decision to terminate Sanders's employment. Imposing such a burden would eliminate the defense and is contrary to this Court's decisions.

### E. The District Court's Misunderstanding of the Defense Led it to Incorrectly Instruct the Jury.

Guided apparently by its later-demonstrated misunderstanding of the same-decision defense, the district court did not properly instruct the jury on how to apply the defense. BNSF provided the Court with the following proposed jury instruction on the defense:

> Only if Plaintiff proves the essential elements described to you in Instruction [13], then you must also consider whether BNSF would have taken the same unfavorable personnel action against the Plaintiff regardless of the protected activity.
>
> The law does not prohibit a railroad from disciplining employees for rules violations. Your verdict must be for BNSF if it has been proved by clear and convincing evidence that it would have taken the same action of dismissing Plaintiff for misconduct and theft of time even if Plaintiff had not engaged in the claimed protected activity.
>
> The Defendant can satisfy this burden in a number of ways, including by showing that it took the adverse employment action because of an honest belief, whether or not correct, that the Plaintiff committed the disciplinary violations at issue, and that it would have issued the same discipline for that reason even if the Plaintiff had not engaged in the protected activity.

45

> Other factors to consider include the temporal proximity be-
> tween the non-protected conduct and the adverse action, the
> thoroughness of the Defendant's investigation, statements
> contained in relevant company policies, and whether the dis-
> cipline was approved by others in senior management.

Appx:86, R.Doc:136:18. In support of its instruction, BNSF cited, among

other authority, this Court's decisions in *Kuduk* and *Blackorby v. BNSF*

*Ry. Co.*, 936 F.3d 733, 737 (8th Cir. 2019). Appx:86, R.Doc:136:18.

The district court, however, declined to include most of the lan-

guage from BNSF's proposed instruction—and declined to include *any* of

the language telling the jury how to evaluate the defense. Appx:123,

R.Doc:223:26. The court instead provided the jury with what effectively

amounts to a single-statement instruction:

> Only if [] Sanders proves the essential elements described to
> you in Instruction No. 13, then you must also consider
> whether BNSF would have fired [] Sanders regardless of []
> Sanders engaging in protected activity. Your verdict must be
> for BNSF if it has been proved by clear and convincing evi-
> dence that BNSF would have fired [] Sanders even if [] Sand-
> ers had not engaged in protected activity….

Appx:123, R.Doc:223:26. BNSF timely objected that the district court's

instruction omitted its language outlining the factors to be considered in

applying the defense. JTTR:7:1135:5-18, 7:1138:11-16.

46

Simply reciting the statutory language on the same-decision defense is insufficient guidance to provide a jury. "The jury should receive instructions on issues supported by competent evidence in the record." *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 537 (8th Cir. 2015). Moreover, those instructions must "fairly and adequately represent the evidence and the law." *Zebley*, 625 F.3d at 455 (quotation omitted). The factors to be considered, as established by this Court's jurisprudence, are not intuitive and must be explained to a jury before it can be trusted to properly apply the law.

This is a situation where the jury needs *guidance* to properly apply the law. *See Vance v. Ball State Univ.*, 570 U.S. 421, 445-46 (2013) (holding that in determining employer liability in harassment cases "the jury should be instructed that the nature and degree of authority wielded by the harasser is an important factor to be considered in determining whether the employer was negligent"). That point is well-illustrated by other decisions of this Court.

In *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946 (8th Cir. 1999), for example, Belk sued his employer, Southwestern Bell Telephone Co. ("SWB"),

47

for claims under the Americans with Disabilities Act. *Id.* at 948. The district court refused to provide SWC's proposed business necessity instruction and stated that the cumulative instructions adequately covered business necessity. *Id.* at 952. On appeal, SWC argued that it "presented relevant and persuasive evidence" of business necessity through the testimony of Dr. Gephardt. *Id.* at 951. This Court held it was error to to deny the proposed instruction stating:

> While it is the province of the fact finder to assess the credibility of the overall testimony, SWB was entitled to an instruction on business necessity *so that the jury could appreciate the value and purpose of Dr. Gephardt's explanations. The court's failure to instruct the jury was error.*

*Id.* at 953 (internal citations omitted) (emphasis added); *see Walker v. AT&T Techs.*, 995 F.2d 846, 850 (8th Cir. 1993) ("[W]hen a proposed instruction addresses an issue that is crucial to a fair presentation of the case to the jury, the trial court has the obligation to give an appropriate instruction on that issue….").

In *Wurster v. Plastics Grp., Inc.*, 917 F.3d 608, (8th Cir. 2019), the Court considered the converse situation, a district court's decision to give detailed instructions. The critical instruction for the defendant in that

products liability case concerned whether the defendant "acted reasonably by not using an alternative design for its gas cans." *Id.* at 615. This Court affirmed concluding "[t]he instruction was *necessary to provide the jury with the proper factors for conducting the risk-utility test* required for design defect claims." *Id.* Importantly, that instruction did not simply tell the jury "to determine whether an alternative design is reasonable and whether its omission renders the gas can not reasonably safe." *Id.* at 614. As this Court pointed out, that instruction provided the jury guidance in the form of *a list of eleven different factors* to consider regarding the risk-utility test. *Id.* at 613.[11]

This Court again noted the importance of properly guiding a jury's analysis in *Rahn v. Hawkins*:

> One purpose of jury instructions is to inform the jury of various permissible ways of resolving the issues in the case, and a party is entitled to an instruction on its theory of the case so long as it is legally correct and there is factual evidence to support it. The problem with giving only the more general excessive force instruction is that it may mislead the jury as to what is permissible under the law. One can easily imagine a jury, having been given only the general standard, concluding

---

[11] *See* Appellee's Brief at 21-22, *Wurster*, 917 F.3d at 608 (No. 17-2698), 2017 WL 6552208, at *21-22 (quoting the contested instruction in full).

49

> that an officer was "objectively reasonable" in shooting a flee-
> ing suspect who posed no threat to the officer or others. But
> such a result would be contrary to the law and would work an
> injustice to the injured plaintiff.

464 F.3d 813, 818 (8th Cir. 2006), *overruled on other grounds by Rivera v. Illinois*, 556 U.S. 148 (2009) (internal citation omitted) (internal quotation marks omitted).

As in *Belk, Wurster*, and *Rahn*, the jury here needed guidance to appreciate the meaning and value of the evidence BNSF offered on the defense. BNSF tried to offer that guidance, but the district court declined and left the jury to guess what factors this Court has advised should be considered. As given, the district court's instruction did not even explain to the jury how it was supposed to weigh the alleged comparators when analyzing BNSF's defense. That is especially concerning considering it is one of the two reasons the district court concluded BNSF failed to estab-lish the defense. Appx:170-72, R.Doc:309:10-12.

The district court was seemingly well-aware that the statutory lan-guage is not all that is needed when determining whether the defense applies. In its order denying BNSF's motion for judgment as a matter of law, the court quoted the seven factors that should be considered "[i]n

50

analyzing a defendant's affirmative defense." Appx:170-71, R.Doc:309:10-11 (quoting *Dafoe*, 164 F. Supp. 3d at 1115–16). It also included the above discussion of the two pieces of evidence it found meaningful.

As outlined above, the district court also suggested there are other factors to be considered (*e.g.*, treatment of purported, but not actually, similarly situated employees and the independence or not of another manager involved in the decision). Although BNSF disagrees with the district court's view on those points, the court's use of them is further indication that the jury needed additional guidance. Like the factors BNSF points to, those the district court relied on do not flow from the unadorned statement of the defense the court instructed the jury on. But the Court declined to so instruct the jury. JTTR:7:1135:5-18, 7:1138:11-16.

BNSF acknowledges that the district court adopted its instruction from this Circuit's pattern jury instructions. *Compare* 8th Cir. Civil Jury Instr. § 18.50 (2021), *with* Appx:123, R.Doc:223:26; *see* 1135:12-14 ("I did not see that in the pattern instruction, so I didn't include it for that reason…."). Pattern instructions are not binding and do not necessarily constitute correct statements of the law or of the instructions required in a

51

given case: "The 'model' jury instructions are not promulgated by this [C]ourt. Unless mandated by this [C]ourt in a decision, *they may serve as helpful suggestions*, but are not binding on the district courts." *See United States v. Owens*, 966 F.3d 700, 705-06 (8th Cir. 2020) (emphasis added) (internal quotation omitted).[12] Even if they were, the instruction is still deficient in that it fails to provide an example applying the legal standard to the facts of the case as indicated in the model instruction. *Compare* 8th Cir. Civil Jury Instr. § 18.50 (2021), *with* Appx:123, R.Doc:223:26.

The same-decision defense is an instance where the pattern instruction is simply insufficient. The abbreviated language used, and thus the instruction the district court gave here, does not account for the decisions of this Court and others, discussed above, outlining how the defense

---

[12] In fact, the authors explicitly caution against the type of non-critical acceptance of the pattern jury instructions exhibited here: "Every effort has been made to assure conformity with current Eighth Circuit law; however, it cannot be assumed that all model instructions in the form given necessarily will be appropriate under the facts of a particular case….It is important to note that because each case turns on unique facts, instructions should be drafted or adapted to conform to the facts and the law in each case." *Model Jury Instructions*, UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT, https://www.ca8.uscourts.gov/model-jury-instructions (last visited Apr. 26, 2023).

Appellate Case: 23-1021     Page: 61     Date Filed: 04/27/2023 Entry ID: 5270387

works and the factors relevant to evaluating it. The comments accompanying the pattern instruction also indicate that the authors did not consider that caselaw, as the comments refer only to the clear-and-convincing standard of proof and do not discuss the substance of the defense. In short, the pattern instruction on the defense does not adequately state the law, and the district court's decision to similarly fail to do so, was error.[13]

The disconnect evidenced here between this Court's jurisprudence and the district court's instruction is precisely the kind of disconnect jury instructions are designed to alleviate. The district court was keenly aware of, and addressed, the problem when it involved the evidence required to establish the contributing factor element of Sanders's claim.

---

[13] The previous discussion highlights another example. This Court has long required district courts to provide a business judgment instruction in employment discrimination cases, yet the model jury instructions make no mention of a business judgment instruction for FRSA claims. *See Walker*, 995 F.2d at 850 (holding that failing to instruct on the business judgment rule unfairly prejudices defendants and deprives them of a fair trials); *see also Bauer v. Curators of the Univ. of Mo.*, 680 F.3d 1043, 1046 (8th Cir. 2012) ("Because an employer is entitled to make its own subjective personnel decisions…for any reason that is not discriminatory under Title VII, this court requires district courts, on request, to give the business judgment instruction in a Title VII case.").

53

Though Instruction No. 13 set out the elements of Sanders's claim, the district court understood it was necessary to provide added explanation on the contributing factor element in light of this Court's caselaw. *See* Appx:116-17, 119-21, R.Doc:223:19-20, 22-24 (providing additional explanation of the contributing factor element in Instruction Nos. 15, 16, and 17). But when it came to BNSF's affirmative defense, the district court declined to provide guidance. That was error.

## F. The District Court's Instruction Error Prejudiced BNSF, Thus Warranting a New Trial on the Defense.

The district court's error prejudiced BNSF and thus satisfies this Court's standard for granting a new trial based on jury-instruction error. *See Cox*, 163 F.3d at 496-97.

Again, *Belk* is instructive. After finding error there, this Court reversed due to the decision to deny the proposed instruction stating:

> We also have determined, as the case law requires us to do, that SWB was prejudiced by the court's failure to give a business necessity instruction. The court's error prejudiced SWB *because the jury was not given the opportunity to properly weigh Dr. Gephardt's testimony against Belk's proffered evidence. Without the appropriate instruction, it is not so apparent that the jury "clearly rejected" SWB's business necessity defense.*

*Belk*, 194 F.3d at 953 (internal citations omitted) (emphasis added).

54

Appellate Case: 23-1021     Page: 63     Date Filed: 04/27/2023 Entry ID: 5270387

BNSF similarly put on ample evidence to address the factors the caselaw apply. BNSF thus requested language specifically instructing the jury that it could consider "the thoroughness of the Defendant's investigation, statements contained in relevant company policies, and whether the discipline was approved by others." Appx:86, R.Doc:136:18. Absent those instructions from the court, the jury could not adequately appreciate the meaning or value of evidence establishing that (1) BNSF has policies prohibiting theft and dishonesty, (2) BNSF properly adhered to its investigatory and disciplinary procedures and independent PEPA review, (3) Sanders's dismissal was approved by Detlefsen and Sundem, (4) Sanders had the opportunity to appeal the decision, and (5) the decision to dismiss Sanders was upheld by both OSHA and the NRAB. Appx:613-15, 623-27.

Without proper guidance, the jury was unable to appropriately weigh that evidence in accordance with this Court's caselaw. BNSF's requested instruction, however, would have allowed the jury to contextualize that evidence and correctly analyze BNSF's affirmative defense. It is therefore inconceivable that the failure to instruct the jury about what to consider did not have a probable effect on its verdict.

Appellate Case: 23-1021    Page: 64    Date Filed: 04/27/2023 Entry ID: 5270387

The district court's decision to give a legally insufficient instruction compounded its error in misapplying the defense. Without a fair opportunity to present its case in its pre- and post-trial motions, BNSF's only realistic opportunity to have its defense considered was the jury. The district court defeated that opportunity by leaving the jury without proper guidance on the law. The issue of BNSF's affirmative defense "involve[d] a point so important that failure to give the instruction seriously impaired [BNSF's] ability to present an effective case." *Cox*, 163 F.3d at 496-97. Accordingly, the Court should reverse the judgment and remand for a new trial based on the district court's jury-instruction error. *Id.*; *see Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 598 (8th Cir. 1999). BNSF believes that such a new trial could be appropriately limited to the defense to avoid a retrial of all other issues in the case.

## CONCLUSION

BNSF presented strong evidence on the various factors courts use in deciding the same-decision affirmative defense. Arguably, BNSF was even entitled to judgment as a matter of law on the defense. The three circuit court decisions discussed above all granted BNSF judgment as a matter of law, either before or after a trial, on similar evidence. BNSF

Appellate Case: 23-1021    Page: 65    Date Filed: 04/27/2023 Entry ID: 5270387

understands however, that granting judgment as a matter of law in the face of an adverse jury determination is a high burden. Here, however, the jury did not receive proper guidance to fairly decide the defense, an error that stemmed from the district court's misunderstanding of the law. The Court should accordingly reverse the judgment below and order a new trial.

Appellate Case: 23-1021   Page: 66   Date Filed: 04/27/2023 Entry ID: 5270387

Dated: April 26, 2023.

Respectfully submitted,

s/ Bryan P. Neal
Bryan P. Neal
 Texas Bar No. 00788106
Weston J. Mumme
 Texas Bar No. 24108300
Holland & Knight LLP
One Arts Plaza
1722 Routh Street
Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (Fax)
Email: bryan.neal@hklaw.com
Email: weston.mumme@hklaw.com

Tracey Holmes Donesky
 Minnesota Bar No. 302727
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 335-1500
(612) 335-1657 (Fax)
Email: tracey.donesky@stinson.com

Attorneys for Appellant
BNSF Railway Company

58

# CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. The brief complies with the type-volume limitations of Fed. R. App. P. 32 because, excluding the parts of the document exempted by Rule 32(f), this brief contains 10,490 words.

2. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook font, 14 point.

s/Bryan P. Neal
Bryan P. Neal

Appellate Case: 23-1021     Page: 68     Date Filed: 04/27/2023 Entry ID: 5270387

# ECF CERTIFICATIONS

Pursuant to local rules, I certify that all required privacy redactions have been made.

s/Bryan P. Neal
Bryan P. Neal


Pursuant to local rules, I additionally certify that the hard copies to be submitted to the Court are exact copies of the version submitted electronically.

s/Bryan P. Neal
Bryan P. Neal


Finally, pursuant to Local Rule 28A(h), I certify that the CM/ECF submission was scanned for viruses and the brief is free of viruses.

s/Bryan P. Neal
Bryan P. Neal

Appellate Case: 23-1021    Page: 69    Date Filed: 04/27/2023 Entry ID: 5270387

## CERTIFICATE OF SERVICE

I certify that on April 26, 2023, I filed this brief with the Clerk of the Court, by uploading an electronic version of the brief via this Court's Case Management/Electronic Case Filing (CM/ECF) System. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

s/Bryan P. Neal
Bryan P. Neal

Appellate Case: 23-1021    Page: 70    Date Filed: 04/27/2023 Entry ID: 5270387